# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 22-cv-1305

**STEPHEN FINK,**

     Plaintiff,

v.

**THE CITY AND COUNTY OF DENVER, a Colorado municipal corporation;**
**THE CITY OF AURORA, a Colorado municipal corporation;**
**DOES 1-20, in their individual capacities and whose names are unknown;**

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Stephen Fink, by and through his counsel of record, BAUMGARTNER LAW, LLC, and BEEM & ISLEY, P.C., respectfully submits this Complaint against the Defendants, and allege and aver as follows:

## JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. §1983 and §1988, and the First, Fourth, and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §1331, §1343(a)(3) and (4), and the aforementioned statutory and constitutional provisions.

2.    Venue is proper in the United States District Court for the District of Colorado pursuant to 28 USC §1391(b) because the Defendants are citizens and residents of Colorado, and the events, acts and/or omissions giving rise to this action occurred in Colorado.

## PARTIES

3.      Plaintiff Stephen Fink, is and was at all relevant times a citizen of the State of Colorado, residing and domiciled in Denver, Colorado.

4.      Defendant The City and County of Denver ("Denver" or the "City") is and was at all relevant times a Colorado home-rule municipality with final policy-making authority over the Denver Police Department ("DPD") and its police officers.

5.      At all relevant times, the City was responsible for supervising, enacting, and enforcing the DPD's conduct, policies, and practices; the absence of necessary policies and practices; and for the hiring, retention, supervision, and training of employees and agents of the DPD. The City was also responsible for the actions of officers from other law enforcement agencies from whom the City requested assistance.

6.      Defendant Denver requested the assistance of other law enforcement agencies, including the Aurora Police Department.

7.      Officers from the Aurora Police Department were under the command of the DPD and were acting with the tacit or express authorization of the DPD.

8.      A DPD supervisor was embedded with each team of officers from other law enforcement agencies, including officers of the APD.

9.      The DPD reviewed its "rules of engagement" with the officers from other jurisdictions, including officers of the APD, before allowing them to provide assistance to the DPD.

10.     Thus, Defendant Denver was responsible for the actions of officers from the Aurora Police Department who were policing the streets of Denver with the DPD's authorization and under its control.

11.     The official and express policy of Defendant Denver was to allow the officers of the jurisdictions that were invited to assist the DPD, including officers of the APD, to follow the policies, practices, and/or customs of their own jurisdictions or agencies regarding the use of less-lethal weapons and use of force during the protests.

12.     Defendant, City of Aurora ("Aurora"), is a municipal corporation and/or governmental entity in the State of Colorado with final policy-making authority over the Aurora Police Department ("APD") and its police officers.

13.     Defendants, Does 1 through 20, whether one or more than one, are and were at all relevant times officers, employees, and/or agents of the DPD and/or officers of other agencies or jurisdictions, including officers of the APD, who were acting under color of state law and within the course and scope of their agency or employment with and the authorization of the DPD and/or APD, and who violated the clearly established constitutional rights of Plaintiff as alleged more fully below. Plaintiff does not currently know the true names and capacities of the Defendants sued herein as Does 1 through 20, inclusive, and therefore sue these Defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. The individual Doe Defendants are sued in their individual capacities and are hereinafter referred to as the "Defendant Officers," whether one or more than one.

14.     Upon information and belief, the Defendant Officers are citizens of the State of Colorado.

15.     All Defendants are responsible in some manner for the damages and injuries alleged in this Complaint.

16.     At all relevant times, the acts and omissions of the Defendant Officers were pursuant to the customs, policies, practices, procedures, supervision, and training of Denver, the DPD, Aurora,

and/or the APD.

## GENERAL ALLEGATIONS AND FACTUAL BACKGROUND

### A.    Background Facts Central to Plaintiff's Claims and Injuries

17.    On May 25, 2020, Minneapolis police murdered George Floyd, igniting protests around the country against police violence.

18.    Beginning on May 28, 2020, protesters from diverse backgrounds began to assemble in the downtown Denver area, specifically around the Capitol Building and the surrounding government buildings – the most traditional of forums for protests against governmental abuse of power.

19.    The overwhelming majority of these protesters were assembled to exercise their First Amendment right to peacefully express their views. Among them was the Plaintiff, Stephen Fink, who participated in peaceful protests for three days from May 28 to May 30, 2020.

20.    On or about May 30, 2020, Plaintiff returned to the area of Civic Center Park and the State Capital Building in Denver, Colorado, to again join the ongoing peaceful protests against the murder of George Floyd and police brutality in general.

21.    On the previous days, Plaintiff witnessed police shooting people with chemical pellets and projectiles, so when he returned on May 30, 2020, Plaintiff not only wore a bandana over his nose and mouth as protection against chemical fumes and COVID, but he also wore winter/ski goggles to protect his eyes from pepper balls and other projectiles that were being fired by police.

22.    The type of protests that Plaintiff joined involved peaceful chanting, marching, and observations of 9 minutes of silence to memorialize and acknowledge the length of time it took for George Floyd to suffocate at the hands of a police officer.

23.    At approximately 6:00 p.m., police officers outfitted in riot gear and weapons started forming lines in the area of Lincoln and Colfax in front of the State Capitol Building, and Plaintiff witnessed the officers shooting projectiles indiscriminately at protesters and throwing gas canisters into the crowds.

24.    Between 6:00 and 6:30 p.m., Plaintiff used his smart phone to film what he was observing from the hill of the State Capitol.

25.    Upon information and belief, police officers from both the DPD and the APD had been deployed to that location at same date and time that Plaintiff was there.

26.    At approximately 6:45 p.m., Plaintiff had moved down the hill closer to the intersection of Lincoln and Colfax when his phone battery died.  Within minutes thereafter, the police deployed a gas canister in the area where Plaintiff had been filming.  Plaintiff fell to the ground to reduce his exposure to the noxious fumes.  Once the fumes cleared a bit, Plaintiff stood up and started to move again when he suddenly felt intense and excruciating pain in his groin.

27.    Plaintiff had been shot in the groin with a hard projectile, such as a KIP, or rubber bullet, fired by the Defendant Officers who were in the immediate area of the surrounding protests.

28.    No commands or warnings were issued to Plaintiff before he was suddenly shot in the groin by the Defendant Officers.

29.    Plaintiff struggled back up the hill of the Capitol, shouting that he had been shot, calling for help, and falling to the ground.

30.    Two civilian medics responded while Plaintiff was still on the hill.  They loosened Plaintiff's pants enough to see that he was bleeding from his genitalia, and they gave him gauze to hold over the area and reduce the bleeding.

31.     One of the medics called for an ambulance, and Plaintiff was eventually transported to Denver Health Medical Centerl, where he was evaluated by ultrasound and kept overnight. After his release the following day, he returned to the hospital with increased pain and swelling, and another ultrasound was performed.

32.     Plaintiff was released again with pain medication, and he was bed-ridden for the next two weeks – unable to bring his legs together because of the pain, swelling, and extreme discomfort in his genitalia.

33.     In mid-June 2020, Plaintiff had another ultrasound at which point his doctors determined that his left testicle had been ruptured by the projectile that was fired at his groin by the Defendant Officers.

34.     Plaintiff has not yet lost the testicle, but surgical removal may be necessary in the future.

35.     Plaintiff was not armed with any weapon at the time he was shot in the groin by a hard projectile.

36.     Plaintiff was not rioting or otherwise engaged in any violent, threatening, or dangerous behavior at the time he was shot.

37.     Plaintiff could not have been reasonably perceived as a threat of any kind at any time during his attendance and observation of the protests.

38.     At the time Plaintiff was shot in the groin by the Defendant Officers, the DPD, APD, and their respective officers and agents were using various types of weapons often known as "less-lethal" weapons, including without limitation hard rubber bullets, kinetic impact projectiles ("KIPs"), and pepper balls that can be loaded into a gun or launcher and aimed and fired with precision at an intended target.

39.     Both DPD and APD use 40mm launchers to shoot KIPs.

40.     DPD uses launchers to shoot pepper balls (pepper ball guns).

41.     The Defendant Officers purposefully aimed and fired weapons, loaded with one of these hard projectiles, directly at Plaintiff's groin.

42.     Because of the circumstances under which Plaintiff was shot (i.e., a shot to his groin while in a fog of tear gas and chemicals by police officers in a group without any warnings or direct contact immediately before the shooting), Plaintiff does not know the identity of the specific officer(s) who shot him.

43.     Because officers of both the DPD and APD were known to be in the vicinity where Plaintiff was shot and injured at the date and time of his injury, the Defendant Officers who shot Plaintiff may have been officers of the DPD and/or the APD.

44.     As of the date of this complaint, Plaintiff has not received any correspondence from Denver or Aurora regarding either the identity of the Defendant Officers or the agency to which the Defendant Officers belonged.


B.      **Factual Allegations Relating to Denver's Customs, Policies, Practices, Procedures, Supervision, and Training**

45.     Defendant Denver, through the Mayor, the Chief of Police, and/or the Manager of Safety/Executive Director of Safety, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for training the DPD's police officers, including the Defendant Officers.

46.     The Defendant Officers violated Plaintiff's constitutional rights as previously alleged.

47.     The protests against police brutality that were occurring at the time Plaintiff was shot in

the groin with a hard "less-lethal" projectile started two days earlier, on or about May 28, 2020, and continued almost daily into the middle of June.

48.     In response to the protests and demonstrations, the City, through its law enforcement agency, the DPD, dispatched its officers and officers invited from other agencies and jurisdictions into the streets of the City.

49.     Among these other law enforcement agencies that the City invited to assist in responding to the protests was the APD, which has recently entered into a consent decree to improve its policing following an internal use-of-force review and a review by the Colorado Attorney General's office that revealed systemic use of excessive force and an extensive lack of training in many areas of policing, specifically including the constitutional limits of use of force and de-escalation tactics, among other constitutional violations.

50.     Defendant Denver, as a participant of many past certification review processes (Critical Incident Response Team or "CIRT") of the APD's use of force causing serious bodily injury or death, knew or should have known of these deficient policies, customs, and training before it invited APD officers to join and assist officers of the DPD in responding to the protests.

51.     Nevertheless, Denver invited Aurora police officers to assist and authorized them to use force within Denver city limits without taking any steps whatsoever to ensure that Aurora officers would act within constitutional constraints with regard to peaceful protesters. As such, the Aurora police officers were acting at the direction of the City, as agents of the City, and the City is responsible for their actions, just as if they were officers of the DPD.

52.     The police officers, including officers of the DPD and APD, and specifically the Defendant Officers, were outfitted in protective riot gear and were armed with "less-lethal" munitions,

including chemical sprays (tear gas and pepper spray) and hard, potentially injurious projectiles, such as flashbang grenades, pepper balls, rubber bullets, and other kinetic impact projectiles, that can be loaded into a gun or "launcher," aimed, and fired with precision at any target.

53.     From the very beginning of the protests, Denver and its decision-makers, including the Mayor, the Chief of Police, and the Manager of Public Safety, had knowledge that the DPD had a custom of inflicting injury on protesters, and that the APD had a history of excessive force.

54.     For example, at or near the beginning of the protests, one Denver police officer posted a photograph on Instagram showing himself and two other officers dressed in riot gear with the caption, "Let's start a riot."

55.     According to media reports, this officer joined the DPD in October 2019 and would have completed the Department's 3.5-month-long field training program in January or February of 2020 – just months before being assigned to the protests.

56.     In addition to the overt attitudes of its officers, the City had independent knowledge of DPD customs. In the first days of the protests, the City was inundated with complaints of excessive force against peaceful protesters.

57.     Conventional and social media overflowed with stories, images, and videos of peaceful protesters who were injured due to police violence against them. Many of these instances involved people, who, like Plaintiff, were injured by police with less lethal projectiles shot at their most sensitive body parts, including the face, head, and genitals.

58.     The following are among the many people targeted, shot, and injured by officers and agents of the DPD at or around the same date as Plaintiff:

<u>May 28, 2020</u>

    a.   Michael Acker (shot in the face causing lacerations to the eye and face);

    b.   Emily Heydt (shot multiple times in her hand and groin with pepper balls from short range while she was stopped on her motorbike behind a Denver SWAT truck);

<u>May 29, 2020</u>

    c.   Megan Matthews (shot in the face causing loss of consciousness, multiple lacerations to the head, a broken nose, and broken facial bones);

    d.   Gabriel Thorn (shot in the head);

    e.   Cameraman (name unknown) for Denver Channel 7 (shot four times in the chest while holding a camera to his face and shattering the lens to the camera);

    f.   Christopher Holland (shot in the wrist while holding a protest sign above his head resulting in bone bruising);

    g.   Ellektra Rowland (shot in the head resulting in a contusion);

    h.   Andy Sannier (shot in the chest while filming);

    i.   Gregory Trickle (targeted with laser sights in the face and groin);

<u>May 30, 2020</u>

    j.   Michael McDaniel (shot in the head);

    k.   Elizabeth Epps (shot in the eye and face, causing facial and eye wounds);

    l.   Jax Feldmann (shot in the eye, causing permanent blindness and loss of his eye);

    m.  Alex Wolfson (shot directly in the eyeball causing a detached retina requiring surgery);

    n.   Russel Strong (shot in the face causing the loss of his right eye);

o. Dan Delany (shot in the back of the head while fleeing from officers rendering him unconscious and lacerating his scalp);

p. Brianna Barber (repeatedly shot in the face and head, including the sign she was holding above her head);

q. Scarlet Barnhill (shot in the face, hitting her eyeglasses);

r. James Sweetman (shot with pepper balls in the head and back, causing contusions);

s. Nicholas Orlin (shot in the eye while trying to protect other protesters by covering a spewing gas canister);

t. Shawn Murphy (shot in the eye while merely observing and isolated from any large protest group);

May 31, 2020

u. Gabe Schlough (shot in the face and chest while helping a woman shot with a tear gas canister, causing a massive wound to his face);

v. Zachary Packard (shot in the face and head, causing a broken skull and jaw);

w. Yousef Amghar (shot in the head and chest while holding his hands up and chanting "hands up, don't shoot");

x. Alex Burness of *The Denver Post* (shot in the head and abdomen after he yelled, "Press!");

y. Darian Tindall (shot in chest while her hands were raised above her head);

z. Trevor Hughes (shot in the finger, breaking and severing it and requiring reconstructive surgery);

aa. Ambrose Cruz (shot three times in the eye area causing his eye to be swollen shut,

lacerations, and severe bruising of the face);

<u>June 2, 2020</u>

bb. Darrell Hampton (shot in the face while standing on a sidewalk filming).

46.     Each of the above examples involved the use of force by DPD officers and agents against peaceful protesters, observers, or members of the press, and none of the above people, including Plaintiff, were given the required orders to disperse or otherwise given an opportunity to comply before being shot with less lethal weapons.

47.     Not a single officer has ever been disciplined for any of these serious attacks, demonstrating Denver's approval of the officers' actions and the City's policy-in-fact of forceful suppression of peaceful protests.

48.     The violence against peaceful protesters was so widespread and harmful that it dominated all major media sources, including traditional and social media, and was the subject of numerous citizen complaints. As a result, Denver, including the Mayor, the Chief of Police, and the Manager of Public Safety, knew about most, if not all, the above-alleged incidents.

59.     In fact, even in November of 2020, Denver police officers continued to act within this policy-in-fact of attacking non-threatening protesters. One example of this continued policy-in-fact occurred on November 4, 2020, the day after the presidential election, when Ariel Wolff was peacefully protesting on Colfax Avenue. When asked to leave by Denver police officers, he complied but was still shot in the back of the head with a hard pepper ball that left him with a contusion and chemical burns to his eyes, throat, and mouth. In keeping with the City's policy-in-fact of violent and disproportionate use of force to suppress protests, no officer was disciplined for this conduct. The City's policy remains the same to this day.

60.     There are many more examples of the Denver's actual policy of suppressing peaceful protests, but the above cases are a representative sample of a policy that has been in place at least since the 2011 "Occupy" protests, addressed more fully below.

61.     Denver's failure to supervise, discipline, train, or even reprimand officers for this consistent and now regular illegal use of force demonstrates that the City's leaders and decision-makers have accepted the customs that prevail within the DPD.

62.     Denver's failure to constrain its officers in any way despite being aware of the many injuries its officers had caused and were causing during the protests is clear evidence of the City's utter and deliberate indifference to the customary use of excessive and disproportionate force toward protesters.

63.     In fact, on May 29, 2020, in the midst of ever-increasing reports of injuries to dozens of peaceful protesters, Denver's decision-makers, including the Mayor and Chief of Police, publicly praised the DPD for its "tremendous restraint," stating that the Denver officers' use of less lethal weapons was proper.

64.     Such public praise by the City's decision-makers, not only ratified the officers' unconstitutional conduct, but also demonstrated the City's deliberate indifference to continuing violations of the constitutional rights of protesters by DPD officers.

65.     Once again, the City's decision-makers were acutely aware of the injuries to citizens from less lethal weapons, and expressly ratified the actions of the officers.

66.     Furthermore, four citizen plaintiffs filed an action against Denver on June 4, 2020, *Abay v. City of Denver*, that was subsequently removed to the United States District Court for the District of Colorado, Civ. Action No. 20-cv-01616-RBJ, and included allegations that the City, through its

DPD officers, used and condoned the use of excessive force tactics against peaceful protestors, members of the media, and even third-parties in the vicinity of the protesters to punish them for demonstrating against police brutality and with the intention and/or effect of discouraging their and others' First Amendment right to free speech and expression.

67.     The *Abay* action resulted in the issuance of a temporary restraining order restricting the officers "from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protests or demonstrations … unless an on-scene supervisor at the rank of Captain or above specifically authorizes such use of force in response to specific acts of violence or destruction of property that the command officer has personally witnessed." *Abay v. City of Denver*, 445 F.Supp.3d 1286, 1294 (D.Colo., June 5, 2020).

68.     Around the same time, the City's Executive Director of Safety, Murphy Robinson, sent a memorandum to Chief of Police, Paul Pazen, that referred to the recent protest activities and serious injuries caused by pepper balls and rubber-tipped rounds fired by 40-mm launchers. Mr. Robinson requested that the City immediately consider prohibiting the use of 40-mm launchers against any individuals in a crowd during any upcoming protests, that there be an internal review to determine whether such launchers are appropriate for crowd control, and that all DPD officers authorized to use pepper balls be reminded of their training, including that pepper balls may only be fired at the ground and not into a crowd of protesters. A copy of this memorandum is attached hereto and incorporated by reference herein as **Exhibit 1**.

69.     However, officers and agents of the DPD continued to indiscriminately use such weapons against protesters in defiance of the Court's Order, and the City continued to condone and ratify these actions through inaction for the duration of the protests, which continued through the

summer.

70.     The allegations on which the restraining order in *Abay* was based are consistent with the attitude expressed in the now-terminated DPD officer's Instagram post and the findings of the OIM report that a policy, practice, and/or custom existed in the DPD that condoned or was callously indifferent to the use of unnecessary and excessive force by its officers against its own citizens.

71.     It simply cannot be said that the City was unaware of its officers' conduct while the protests were occurring.

72.     The Denver Office of the Independent Monitor ("OIM") also found many problems with the DPD's use of force in a detailed report concerning the DPD's response to the 2020 protests. The OIM report cited observations of DPD officers consistently using less-lethal munitions in troubling ways, specifically including the following:

    a.  Failing to issue orders to disperse in the vast majority of instances before deploying less lethal munitions;

    b.  Deploying pepper ball rounds at persons who were verbally objecting to police behavior and not engaged in apparent physical resistance;

    c.  Deploying pepper ball rounds and other projectiles that nearly or directly impacted prohibited areas of the body, including the head, face, and groin;

    d.  Continuing to deploy chemical, gas, impact, or explosive munitions after their use had already caused people to disperse and leave an area; and

    e.  Failing without good cause to turn on body cameras in the overwhelming majority of incidents in which the officers deployed less lethal weapons.

73.     The OIM report found that not all officers using projectile launchers, including pepper ball

and 40-mm launchers, were trained and certified in using such weapons, and it recommended that the DPD implement standards to specify and ensure that only authorized officers may use such weapons during crowd-control events.

74.     With respect to mutual aid/assistance from other jurisdictions, the OIM report found that officers from other jurisdictions had used the following types of weapons and ammunition against protesters: (1) at least 73 rounds of rubber-ball projectiles/pellets; (2) more than 150 "less-lethal" shotgun rounds, which can be aimed and fired like traditional shotguns and which can also be mistakenly loaded with and fire lethal ammunition; and (3) more than 200 rounds of "beanbags" filled with lead shot. According to the report, the Use of Force Policy and Crowd Management Manual of the DPD did not address the use of such weapons and ammunition one way or the other.

75.     The OIM report not only recommended that the DPD develop agreements, procedures, and command control structures for working with other jurisdictions, but also that the DPD require its mutual aid partners to adhere to DPD's policies and use only the weapons and ammunition approved by the DPD.

76.     The OIM report observed that, given the risks inherent in combining law enforcement agencies, neighboring jurisdictions should have comprehensive mutual aid agreements that specify how agencies will work together, how officers will deploy, what rules of engagement will be followed, and what guiding philosophy will inform their joint response to a mass demonstration.

77.     Denver did not have relevant mutual aid agreements with the APD despite its knowledge of Aurora's pattern and practice of using excessive force and despite inviting APD officers into Denver to help police the protests.

78.     APD officers invited into Denver to help police the protests were under the command of

the DPD, and thus Denver is responsible for its policies, procedures, and customs that allowed APD officers, including the Defendant Officers, to violate Plaintiff's constitutional rights.

79.     The OIM report also found problems with internal tracking and logging of the use of less-lethal weapons during crowd control events; insufficient requirements and policies regarding the wearing and use of body cameras during such events; insufficient supervision and review of officers and corresponding use of force during crowd control operations; failure of officers and supervisors to issue dispersal orders before using force to disperse crowds; lack of sufficient enforcement regarding the prominent display of officers' badge numbers; and allowing untrained or insufficiently trained officers to use "less-lethal" weapons, including pepper ball launchers and other projectile weapons, during crowd control operations.

80.     In particular, Defendant Denver's policy at the time of the protests was that officers were not required to complete use-of-force reports after using "less lethal" weapons at a protest. During the protests, DPD officers believed that they were not required to complete use-of-force reports accounting for their use of force against civilians. It was not until weeks later, after a lawsuit was filed against the DPD in *Abay v. City and County of Denver*, that the DPD command staff at the highest levels ordered DPD commanders and administrative lieutenants to have their officers complete use-of-force reports documenting their use of "less-lethal" weapons.

81.     Defendant Denver knew and understood, prior to the protests, that timely and complete use-of-force reporting is essential for officer accountability and transparency, as well as organizational credibility. Defendant Denver's knowledge of this is reflected in the DPD Operations Manual, which sets forth detailed use-of-force reporting requirements during day-to-day policework. Despite this, Defendant Denver inexplicably applied a different policy to protests.

82.     Defendant Denver's failure to require timely use-of-force reporting allowed DPD officers to escape accountability for use of excessive force during the protests. Officers were aware during the protests that they would not have to account for their use of force, and they were not required to write use-of-force reports or officer statements after the fact until weeks later, when their memories of the events were no longer fresh.

83.     Defendant Denver did not have a written policy that specifically governed the use of body-worn cameras ("BWC") during the protests. Despite the fact that the DPD has had BWC for several years, DPD lieutenants have demonstrated confusion about whether their officers were required to activate their BWC during the protests. As a result, many officers did not activate their BWC, including during events when officers used excessive force on protesters.

84.     The OIM report also found that there was no guidance for high-risk explosive devices, such as rubber-ball grenades and noise-flash diversionary devices ("NFDDs"), and it identified inappropriate and/or insufficient standards for the use of "direct-fired" impact projectiles and pepper balls. Specifically, the report found that the DPD has only one standard for using such direct-fired impact projectiles—defensive resistance—which is defined in the crowd control context as "physical actions by members of a crowd that constitute an unlawful assembly and/or disruption to pedestrian or vehicle traffic." The report continued, "This means that an officer may strike a person directly with pepper ball in response to nothing more than disrupting traffic. We believe that this standard is too low for direct-fired pepper ball use. We believe that striking someone directly with an impact projectile that could cause them serious harm during crowd control should be reserved for situations in which individuals are engaging in no less than active aggression, defined as 'an overt act or threat of an assault, coupled with the present ability to carry

out the action, which reasonably indicates that an assault or injury to a person is likely.'"

85.    In light of these findings, the OIM report made the following recommendations:   that the DPD disallow the use of rubber-ball grenades during crowd control operations; that the DPD articulate clear and specific standards for when rubber-ball grenades and NFDDs may be used; that the DPD revise its standards for pepper ball use; and that direct-fired applications of pepper balls be limited only to circumstances in which a person displays active or aggravated active aggression.

86.    The OIM report highlighted the facially unconstitutional written policy allowing excessive force to be used on protesters such as Plaintiff.

87.    Specifically, the DPD Use of Force Policy explicitly states that these weapons can cause serious bodily injury or death and can only be used to prevent a subject/targeted person from physically harming officers, other civilians, or themselves.

88.     However, the DPD Crowd Control Manual simultaneously allows officers to use the same less lethal weapons against members of a crowd that constitutes an unlawful assembly and/or causes disruption to pedestrian or vehicle traffic.

89.    Shooting peaceful protesters with rubber bullets because they have disrupted traffic is grossly disproportionate force and is unconstitutional.

90.    Thus, the City's use of force policy as written unconstitutionally permits officers to use grossly disproportionate force against crowds, including protesters such as Plaintiff, for nothing more than standing in the street during a protest.

91.    This policy, in itself, is certain to result in serious injuries to non-violent protesters, as it did to Plaintiff. When the policy is coupled with the known custom and ratification of excessive

force, the known custom and ratification of failing to issue dispersal orders, and the known custom and ratification of targeting particularly sensitive and vulnerable areas of the body, such as faces, eyes, and groins, the City's deliberate indifference to the violation of citizens' constitutional rights is clear.

92.     The deficient policies in effect at the time of the protests in May and June of 2020, are found in the Force Related Polices of section 105 of the DPD Operations Manual (revised Jan. 27, 2019) and the DPD Crowd Management Manual (revised Feb. 13, 2019), and they are further identified and discussed in the OIM report, which is attached hereto and is incorporated by reference herein as **Exhibit 2**.

93.     Furthermore, the City failed to properly train its officers and agents on the constitutional limits of the use of force, specifically including the use of less lethal munitions during crowd control operations.

94.     The City's insufficient training on these matters is exhibited by the fact that an officer, who had just recently completed the City's officer training program, thought it appropriate to publicly post on Instagram the admonition, "Let's start a riot," as the protests began.

95.     Furthermore, at least two other DPD police officers, Officer Diego Archuleta and Officer Derek Streeter (both of whom are named defendants in another federal lawsuit that involves the shooting of Jax Feldmann directly in his eye with a pepper ball on May 30, 2020), were investigated in two different incidents that occurred during the initial days of the protests in which they used chemicals or direct-fired impact projectiles against protesters or other people who were fleeing, trying to comply with commands, or expressing their contempt for police. Both officers were found, at least in part, to have failed to distinguish between individuals participating in illegal

activity and those merely verbalizing or expressing discontent with police.

96.     Officer Archuleta, who had been with the DPD for four (4) years as of May 2020, had only received one (1) hour of crowd control training during his time at the Academy.

97.     The DPD's failure to properly train and supervise its officers and agents on the constitutional limits of using less lethal munitions, including rubber bullets, its implementation of inappropriate or insufficient policies, its failure to implement new or revised policies, standards, and guidance for its officers relating to the use of less lethal munitions during crowd control events, its failure to implement any limitations on use of force with regard to outside law enforcement agencies, and its failure to correct DPD customs as set forth in the OIM report resulted in the officers' inappropriate and widespread direct-fire use of less lethal munitions, including rubber bullets, against protesters. Such inappropriate direct-fire use, including aiming and firing hard projectiles at people's heads, faces, and groin areas, was the cause of many serious injuries, including the permanent, painful, and disfiguring injuries to Plaintiff's groin and genitalia.

98.     The policy, practice, custom, and/or lack of training that has led to the DPD's use of unnecessary and excessive force pre-existed the incident involving the Plaintiff and has been in place at the DPD for many years. This policy, practice, custom, and/or lack of training applies to the unconstitutional treatment of individuals by DPD officers, as well as unconstitutional treatment of groups of protestors.

99.     In October 2011, DPD officers used "less lethal" munitions, including tear gas and pepper balls, against protesters involved in the "Occupy" demonstrations. At least one civilian was struck in the face. Despite recommendations of the OIM that the DPD employ its Tactics Review Board ("TRB") to assess the tactics used during the clash with demonstrators, including compliance with

existing policies and procedures, and the need for any revisions to such policies and procedures, related training, and recommendations for crowd control tactics to improve outcomes for future demonstrations, the City declined to accept those recommendations.

100.     In January 2017, the OIM again highlighted several noteworthy deficiencies in the DPD's draft Use of Force Policy, including vague and poorly defined key provisions, lack of clarity for the overall standard for when force may be used, less restrictive standards for use of force as compared to other similar large police agencies in the country, and lack of adherence to national standards, including the definition of deadly force.

101.     Despite the fact that Denver, as Colorado's capitol city and state political center, has been the location of past large-scale protests and demonstrations, including the 2008 Democratic National Convention and the 2011 Occupy demonstrations, as well as many other smaller-scale protests, demonstrations, rallies, and events where crowd management issues arise, according to a DPD Training Academy Lieutenant in an interview with the OIM, Denver and the DPD have nevertheless de-emphasized the importance of police training, specifically including training on crowd control and the appropriate use of less lethal weapons, by, among other things, failing to issue training mandates that require officer attendance and participation at training classes and events.

102.     There are dozens of additional documented claims and lawsuits against the City and/or its police officers going back well over ten years in which the City either paid settlements or had verdicts against it based on allegations of the use of unnecessary and excessive force against individuals in non-violent situations.  Recently, Attorney David Lane compiled a list of just some of those incidents as an exhibit to a Complaint against the City captioned *Naphtali et al. v. City*

*and County of Denver,* Case No. 1:20-cv-02198. A version of Mr. Lane's exhibit is attached hereto and incorporated by reference herein as **Exhibit 3**.

103. If the City had clear policies and guidelines about the proper handling of peaceful demonstrations, crowd control, the proper and safe use of less-lethal projectiles and munitions, and the protection of constitutional rights, then the Denver police officers, specifically including the Defendant Officers, would have known that they could not fire hard projectiles indiscriminately into a gathering of people, aim and shoot such projectiles at specific individuals' heads, faces, and/or groins, continue to use such munitions after a crowd or group had dispersed, and, in any event, that they could not use any type of force, whether lethal or less-lethal, against any person, such as Plaintiff, who was unarmed, unthreatening, not disobeying commands, and not committing any violent or potentially dangerous offense.

104. The Defendant Officers' unconstitutional conduct of shooting rubber bullets or other hard projectiles at the Plaintiff's groin was taken pursuant to the unconstitutional customs, policies, procedures, and lack of sufficient training and supervision by the City and the DPD.

        **C.**    **Factual Allegations Relating to Aurora's Customs, Policies, Practices, Procedures, Supervision, and Training**

105. Defendant Aurora failed to adequately train its officers in the constitutional responses to peaceful demonstrations.

106. Defendant Aurora failed to adequately train its officers in the use of "less-lethal" weapons, including 40mm launchers, beanbag shotguns, Arwen rubber ball grenades, Stinger grenades, and chemical munitions. The training provided by Aurora was inordinately focused on crowd control (as opposed to crowd management) and was outdated, insufficient, and inconsistent with generally

accepted standards and practices. Defendant Aurora had knowledge of the importance of training on the proper use of "less-lethal" weapons, and its failure to adequately train officers in the use of these weapons constituted deliberate indifference.

107.     Defendant Aurora failed to adopt adequate policies in the constitutional responses to peaceful demonstrations.

108.     Defendant Aurora also failed to adopt policies on the circumstances under which specific "less-lethal" weapons, such as 40mm launchers, beanbag shotguns, Arwen rubber ball grenades, flashbang grenades, and Stinger grenades, can be used against civilians, including during protests or demonstrations.

109.     APD's use of force policy and policy on use of "less-lethal" weapons rely on reprinting Colorado statutes. APD does not provide specific policies on the circumstances under which specific "less-lethal" weapons, such as 40mm launchers, may be used against civilians, including during protests or demonstrations. APD's policies fail to provide adequate and clear guidance to officers on the appropriate use of force and use of "less-lethal" weapons that protects the constitutional rights of citizens.

110.     In addition, after the protests, APD supervisors suggested that APD officers write their use of force statements using language that would state that their uses of force were within or consistent with policy.

111.     Because Defendant Denver authorized agencies providing mutual aid to utilize their own policies, the use of force by APD officers was also consistent with and authorized by Defendant Denver.

112.     Similarly, Defendant Aurora conducted a review of the use of force by APD officers at the

protests and found that all uses of force were authorized by and compliant with the policies of Defendant Aurora.

113.    These constitutional deficiencies are further corroborated by the Colorado Attorney General's report, "Investigation of the Aurora Police Department and the Aurora Fire Rescue" ("AG Report"), dated September 15, 2021, in which the Attorney General's office found a pattern and practice of using excessive force by Aurora police based on current observations and reports and documents from the last five years.  AG Report p. 1.   Causes for this pattern and practice include a culture that emphasizes the justification for force rather than whether it was lawful and appropriate, *id.* at 80; a use-of-force policy and implementation focuses on maximum force permitted under the law, *id.* at 83; and Aurora police fail to adequately document their uses of force, *id.* at 86.

114.    Thus, any such use of force against Plaintiff by the Defendant Officers, who may have been officers of the APD, was consistent with and authorized by Defendant Aurora.

115.    Because Defendant Denver authorized agencies providing mutual aid to utilize their own policies, the use of force against Plaintiff by the Defendant Officers, who may have been officers of the APD, was also consistent with and authorized by Defendant Denver.

116.    Defendant Aurora's policy, practice, and custom of authorizing officers to use "less-lethal" weapons to control and suppress protests was the moving force behind the violations of Plaintiff's constitutional rights to the extent that he was shot in the groin by an officer of the APD.

117.    Defendant Aurora and its final policymakers acted with deliberate indifference to the constitutional rights of protestors by authorizing, both explicitly and implicitly, the use of "less-lethal" force against protestors, such as Plaintiff, who did not pose any safety threat; by failing to

properly train, supervise, and discipline officers regarding the proper use of force against protestors; by failing to rectify the unconstitutional custom of officers using "less-lethal" force to control and suppress demonstrations; and by failing to provide adequate policies. This constituted a conscious choice by Defendant Aurora not to properly train, supervise, discipline, rectify, or provide adequate policies on these issues.

118.    Defendant Aurora has not disciplined any APD officers for their use of force during the protests.


    **D.    Plaintiff's Damages**

119.    The Defendant Officers purposefully aimed and fired a weapon at Plaintiff's groin.

120.    As a direct and proximate result of the Defendant Officers' intentional, arbitrary, excessive, and wholly unnecessary actions and Denver and/or Aurora's policies, practices, customs, and/or lack of supervision and training, which were the moving force and cause of the Defendant Officers' misconduct, Plaintiff suffered injuries, damages, and losses, including without limitation the pain, discomfort and suffering associated with a ruptured testicle, permanent genital disfigurement (including the possible future loss of the testicle), permanent impairment, loss of income in the past and future, loss of economic opportunity, loss of enjoyment of life, great physical and mental pain and suffering, and fear of exercising his First Amendment Constitutional rights to peacefully assemble, peacefully associate, and peacefully express his opinions and beliefs, particularly his opinions and beliefs about racial injustice and police brutality.

## CLAIMS FOR RELIEF
## CLAIMS UNDER FEDERAL LAW, 42 U.S.C. §1983

121.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

122.    The First Amendment of the United States Constitution protects the freedom of speech, association, expression, press, and the right of people to peacefully assemble and petition the Government to redress grievances.

123.    The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures and the use of excessive force in connection therewith. When restraining, detaining, and/or arresting a person, the Fourth Amendment protections only allow police officers to use the amount of force that is reasonable and necessary under the circumstances.

124.    The Fourteenth Amendment protects persons from deprivations of life (including loss of or injury to life), liberty, and property without due process of law, including substantive protections against arbitrary abuses of executive power.

125.    A municipality may be liable under 42 U.S.C. §1983 where a municipal policy or custom causes the constitutional violations, and the municipality's failure to adequately train its officers may form the basis of such municipal policy or custom.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-90 (1989).

126.    Denver, through its Mayor, the Chief of Police, and its Manager of Public Safety, had the ultimate decision- and policy-making power for the DPD and ultimate responsibility for adopting and implementing DPD policies and imparting such policies to DPD's police officers and agents acting on its behalf through training and supervision.

127.    Aurora, through its Chief of Police and Civil Service Commission, had the ultimate

decision- and policy-making power for the APD and ultimate responsibility for adopting and implementing APD policies and imparting such policies to APD's police officers and agents acting on its behalf through training and supervision.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Violation of Fourth Amendment of U.S. Constitution**
**Use of Unnecessary, Unreasonable and Excessive Force**
**(Plaintiff against the Defendant Officers)**

128.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

129.    At all relevant times, the Defendants acted under color of state law, and the Defendant Officers acted within the course and scope of their employment and/or agency as law enforcement officers for Denver and/or Aurora.

130.    Plaintiff had a protected Fourth Amendment interest against being injured and victimized by the use of excessive force by law enforcement officers, specifically including the Defendant Officers.

131.    A "seizure" for purposes of the Fourth Amendment to the U.S. Constitution occurs when an officer intentionally applies physical force to the body of a person or show of authority to restrain his or her freedom to simply walk away.  *See, e.g., Torres v. Madrid*, 141 S.Ct. 989, 993 (2021); *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Fogarty v. Gallegos*, 523 F.3d 1147, 1155 (10th Cir. 2008).   Furthermore, the high-level use of force of an officer pointing a gun at a person constitutes a seizure as a matter law.  *See Thompson v. Rahr*, 885 F.3d 582, 586 (9th Cir. 2018). Even an unintended person is "seized" if he or she is an object of the detention.  *Browar v. County of Inyo*, 489 U.S. 593, 596 (1989).

132.    Whether the force used by police officers is unreasonable and thus excessive is determined by an objective analysis of the facts and circumstances that existed at the time the force was applied, including the severity of the suspected crime, whether an immediate threat was posed to the safety of the officers and others, and whether the suspect was actively resisting or evading arrest. *Fogarty*, 523 F.3d at 1159-60.

133.    Reasonable officers at the time of the actions alleged herein would have been on notice that using less lethal munitions (such as KIPs, rubber bullets, and pepper balls) or "any other type of pain-inflicting compliance technique" may constitute excessive force if applied under circumstances that failed to warrant such use of force. *Fogarty*, 523 F.3d at 1161-62.

134.    The Defendant Officers seized the Plaintiff by purposefully aiming a weapon at Plaintiff and shooting him directly in his groin, which stopped Plaintiff and/or restricted his freedom of movement as previously alleged.

135.    Such actions by the Defendant Officers objectively manifested an intention to stop and restrain Plaintiff.

136.    The Defendant Officers had no warrants authorizing the seizure of Plaintiff.

137.    Each of the Defendant Officers failed to intervene to prevent the other Defendant Officers from violating Plaintiff's constitutional rights.

138.    The actions of the Defendant Officers were objectively unreasonable in light of the circumstances surrounding Plaintiff because Plaintiff had not committed any crime, nor was there any basis on which the Defendant Officers could have reasonably believed that Plaintiff had committed any crime.

139.    Plaintiff was not armed, resisting arrest, fleeing, or threatening the Defendant Officers or

any other officers or persons.

140.    Thus, the Defendant Officers had no legal justification to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

141.    The Defendant Officers recklessly created the situation in which excessive force was used. They had sufficient time and opportunity to assess the situation and surrounding circumstances but failed to do so.  Instead, the Defendant Officers simply aimed and fired at Plaintiff's groin without any warnings, commands, reason, or provocation, thereby causing severe pain, injury, and physical disfigurement to Plaintiff.

142.    No use of force, much less shooting dangerous injury-producing projectiles at particularly sensitive body parts, such as the groin area, was warranted against the Plaintiff under the circumstances that existed at the time.  Accordingly, shooting the Plaintiff in the groin with a hard projectile was patently and objectively unreasonable.

143.    The Defendant Officers' use of excessive, unreasonable, and unnecessary force to seize Plaintiff under the circumstances violated clearly established law and rights protected by the United States Constitution.

144.    The Defendant Officers engaged in these actions intentionally, willfully, and wantonly, and demonstrated deliberate indifference to and reckless disregard for Plaintiff's constitutionally protected rights.

145.    As a direct and proximate result of the Defendant Officers' unconstitutional acts and omissions, Plaintiff's constitutional rights were violated, and he suffered injuries, damages, and losses as previously alleged above.

**42 U.S.C. §1983 - Violation of Fourteenth Amendment of U.S. Constitution**
**Unnecessary, Unreasonable & Excessive Force**
**(Plaintiff against the Defendant Officers)**

146.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

147.    Plaintiff had protected Fourteenth Amendment Substantive Due Process rights and interests against being unreasonably, arbitrarily, and intentionally harmed by the use of unnecessary and/or excessive force by law enforcement officers, specifically including the Defendant Officers.

148.    The Defendant Officers deprived Plaintiff of his Fourteenth Amendment substantive due process rights by purposefully firing a hard projectile at Plaintiff's groin without any warnings, commands, reason, or provocation, thereby causing severe pain, injury, and physical disfigurement to Plaintiff.

149.    Because Plaintiff was not committing any crime, fleeing, or otherwise threatening anyone, the Defendant Officers had sufficient time for deliberation before choosing to aim and shoot Plaintiff in the groin.

150.    The Defendant Officers aimed a weapon, loaded with hard projectiles, directly at Plaintiff's groin – not at parts of the body that would be less likely to cause serious or disfiguring injuries or, even more prudently, at an area of the ground a safe distance from Plaintiff's body – with the intention of causing, or with deliberate indifference to the possibility that doing so would likely cause, serious bodily harm and injury to Plaintiff.

151.    The Defendant Officers' actions were not only intentional, but also arbitrary and malicious under the circumstances given that one of them aimed and shot directly at Plaintiff despite the fact

that he had not committed any crime, nor was he armed, rioting, or threatening any persons.

152.    The Defendant Officers acted maliciously and/or with excessive zeal that amounted to an abuse of power, and they acted for the purpose of causing Plaintiff harm that was unrelated and unnecessary to any legitimate policing objective.

153.    Each of the Defendant Officers failed to intervene to prevent the others from violating Plaintiff's constitutional rights.

154.    Such callous and arbitrary actions by the Defendant Officers, who are supposed to be charged with serving and protecting members of the public – not arbitrarily shooting at them – represent conscious-shocking, indecent, intentional, and/or deliberately indifferent conduct directed at Plaintiff in violation of his right to life, the enjoyment of it, and liberty protected under the U.S. Constitution.

155.    As a direct and proximate result of the Defendant Officers' unconstitutional acts and omissions, Plaintiff's constitutional rights were violated, and he suffered injuries, damages, and losses as previously alleged above.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. §1983 - Violation of the First Amendment of the U.S. Constitution
### Unreasonable Suppression of Free Speech, Assembly and/or Association
### (Plaintiff against the Defendant Officers)

156.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

157.    Plaintiff had protected First Amendment rights to express his viewpoints and support by attending peaceful protests to redress grievances against police misconduct, to assemble and associate with other peaceful protesters, and/or to record and document such public protests and

the public response by the police to such protests.

158.     As previously alleged, Plaintiff was in the area where peaceful protests were occurring when he was shot in the groin with a hard projectile by the Defendant Officers as he was getting up and starting to walk after being exposed to tear gas or other noxious chemical gas.

159.     As previously alleged, there was no reason or justification for using any force against Plaintiff when the Defendant Officers shot him in the groin with a rubber bullet, pepper ball, or other similar hard projectile.

160.     The Defendant Officers violated the Plaintiff's First Amendment rights by targeting and shooting him in the groin to suppress, punish, and/or retaliate against Plaintiff for peacefully expressing himself and his viewpoint against police misconduct and brutality, documenting or recording the protests, and/or being associated with those who were out protesting against police misconduct and brutality.

161.     As a direct and proximate result of the Defendant Officers' unconstitutional acts and omissions, Plaintiff's constitutional rights were violated, and he suffered injuries, damages, and losses as previously alleged above.


**FOURTH CLAIM FOR RELIEF**
**Unconstitutional Policies, Customs, and Practices, Failure to Train, and Ratification**
**Resulting in Violations of Plaintiff's Constitutional Rights**
**(Plaintiff against the City and County of Denver)**

162.     Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

163.     As previously alleged, the Defendant Officers aimed and shot rubber bullets, KIPs, or other similar hard projectile at Plaintiff's groin for no justifiable reason, thereby violating Plaintiff's

constitutional rights under the Fourth, Fourteenth, and/or First Amendments to the U.S. Constitution.

164.    The DPD has a long-standing custom of using grossly disproportionate force against peaceful protesters, going back to at least 2011, and continuing well past the George Floyd protests of May and June 2020. Denver has taken no action to curtail or rectify this unconstitutional custom, and City leaders have ratified and even praised the DPD for these customs.

165.    Defendant Denver has a policy, practice, and/or custom of tolerating violations of constitutional rights by its police officers, which prompted the Defendant Officers to engage in such actions that targeted protesters, and which allowed and/or prompted Defendant Officers to use excessive and completely unnecessary and unjustified force against Plaintiff.

166.    Denver's written policies are facially unconstitutional. Denver failed to adopt, revise, implement, enforce, and/or properly train its officers, including the Defendant Officers, on policies and practices that delineate the constitutional limitations of force, the circumstances under which force should be used, the type of weapons that are appropriate under the circumstances, including the use of less-lethal weapons, and how such weapons should be used to prevent or minimize unnecessary harm and constitutional violations to the citizenry, especially in the context of protests and crowd control.

167.    Denver further failed to properly train its officers, including the Defendant Officers, on distinguishing illegal or threatening behavior from merely demonstrative behavior expressing discontent with the police or other persons or groups.

168.    Based on earlier protest movements, such as the "Occupy" protests, a long history of claims and complaints of excessive and inappropriate force by its officers, and the policy deficiencies

identified by the OIM, Denver was aware that such constitutional violations would be certain, yet still failed to adopt proper policies and/or provide proper training on the constitutional limitations of targeting individuals and using force against them to suppress protected First Amendment expression and activities.

169.    Denver's unconstitutional policies, practices, customs, and/or training failures in connection with First Amendment protections were further exemplified and ratified by its issuance of a curfew that provided no exceptions for activities protected by the First Amendment.

170.    Accordingly, Denver adopted an official policy of targeting protesters (and those perceived to be or associated with protesters) during the curfew hours, while not targeting non-protesters (or those who appeared not to be protesting).  This was intended to further suppress protected First Amendment activities, including the right to free speech, expression, association, and assembly, and it violated the First Amendment.

171.    Denver further failed to provide any training or guidance to its police officers about how to properly enforce curfews, such as not randomly shooting or attacking people simply because they were outside after curfew hours, recognizing and distinguishing peaceful protected speech and expression as opposed to non-peaceful and violent rioting, first stopping and questioning people about why they were out after curfew, and then issuing appropriate citations rather than assuming a violation and using injurious force against them.

172.    Denver, through its policymakers, further ratified the constitutional violations against Plaintiff by publicly praising the actions of its officers and the officers of other jurisdictions, including officers of the APD, and their handling of the protests despite the City's knowledge that the officers were already using excessive force against protesters, by allowing the officers to

continue engaging in such unconstitutional conduct despite internal recommendations to the contrary and despite a federal court order enjoining such conduct, and by failing to prosecute or otherwise properly discipline any officers who committed similar violations.

173.    By allowing the officers of mutual aid agencies, including APD officers, to follow the policies, practices, and customs of their own agencies with respect to the use of less lethal weapons, Denver ratified and adopted the unconstitutional policies, practices, and customs of the mutual-aid agencies as its own.

174.    Denver's policies, practices, customs, failure to train, failure to discipline, and ratification by its final policymakers, were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiff's constitutional rights.

175.    As shown by OIM evaluations and recommendations in the aftermath of the 2020 protests, OIM evaluations and recommendations that followed earlier demonstrations, and other examples of police misconduct by officers of the DPD over the past decade and beyond, the need for proper policies, practices, training and supervision of officers on the constitutional limits of force, including how to properly handle non-violent citizens and protesters, demonstrations, curfews, and crowd control, was so obvious and lacking and so likely to result in the violation of constitutional rights, that the City was deliberately indifferent to the need.

176.    As a direct and proximate result of Denver's unconstitutional policies, practices, customs, failure to properly train and supervise its officers, and its acts and omissions in relation thereto, the Defendant Officers believed they could target protesters, specifically including the Plaintiff, by using less lethal weapons against them in ways that were certain to cause pain and inflict serious injuries.

177.    Consistent with Denver's unconstitutional policies, practices, customs, and failure to properly train and supervise its police officers, the Defendant Officers targeted Plaintiff and shot him directly in the groin with rubber bullets or other similar hard projectiles simply because he peacefully participating or otherwise present at a protest; and as a result, Plaintiff suffered permanent and disfiguring injuries, permanent impairment, and other damages and losses as previously alleged above.

### FIFTH CLAIM FOR RELIEF
**Unconstitutional Policies, Customs, and Practices, Failure to Train, and Ratification Resulting in Violations of Plaintiff's Constitutional Rights
(Plaintiff against the City of Aurora)**

178.    Plaintiff incorporates by reference herein all preceding allegations set forth in this Complaint.

179.    As previously alleged, the Defendant Officers aimed and shot rubber bullets, KIPs, or other similar hard projectile at Plaintiff's groin for no justifiable reasons, thereby violating Plaintiff's constitutional rights under the Fourth, Fourteenth, and/or First Amendments to the U.S. Constitution.

180.    As previously alleged, during the protests, Defendant Denver requested officers from other jurisdictions, including personnel from the APD.

181.    Because APD officers were among the police officers in the area at the date and time Plaintiff was shot by a police officer in his groin, one or more of the Defendant Officers responsible for shooting Plaintiff may have been employed by the APD and thus responsible for inflicting Plaintiff's injuries and damages.

182.    The APD is notorious for maintaining a custom of using excessive force that violates the

boundaries of the constitution. The Attorney General's office conducted extensive observations of the APD and found that "Aurora Police has a pattern and practice of using excessive force" and that it "has repeatedly engaged in unlawful and unconstitutional uses of force, regularly applying greater force than reasonably warranted by the situation." AG Report, p. 1. It further found that Aurora officers "were often quick to escalate and use dangerous and unnecessary tactics that led to unnecessary force. Aurora needs to change its approach to civilian encounters by using force as a last resort, not as the immediate option." AG Report, pp. 84-85.

183. According to the AG's Report, Aurora's pattern and practice of excessive force is based on "systemic and severe culture problems created by several factors" including that APD "culture leads to frequent use of force, often in excess of what the law permits." AG Report, p. 2.

184. Defendant Denver knew or should have been aware of Defendant Aurora's plainly excessive and unconstitutional pattern and practice of using excessive force.

185. APD officers repeatedly violated clearly established constitutional standards by employing excessive force against peaceful protesters who were simply engaging in protected activities.

186. Defendant Aurora failed to properly train its officers, including Defendant Officers, on policies and practices that delineate the constitutional limitations of force, the circumstances under which force should be used, the type of weapons that are appropriate under the circumstances, including the use of less-lethal weapons, and how such weapons should be used to prevent or minimize unnecessary harm and constitutional violations to the citizenry, especially in the context of protests and crowd control.

187. The need for proper policies, practices, training and supervision of APD officers on the constitutional limits of force, including how to properly handle non-violent citizens and protesters,

demonstrations, curfews, and crowd control, was so obvious and lacking and so likely to result in the violation of constitutional rights, that Aurora was deliberately indifferent to the need.

188.    Defendant Aurora's policies, practices, customs, failure to train, and failure to discipline were the moving force behind the Defendant Officers' misconduct and thus the cause of the violation of Plaintiff's constitutional rights.

189.    As a direct and proximate result of Defendant Aurora's unconstitutional policies, practices, customs, failure to properly train and supervise its officers, and its acts and omissions in relation thereto, the Defendant Officers believed they could target protesters, specifically including the Plaintiff, by using less lethal weapons against them in ways that were certain to cause pain and inflict serious injuries.

## REQUEST FOR PUNITIVE DAMAGES UNDER FEDERAL LAW
### (Against the Defendant Officers)

190.    Federal courts have held that punitive damages are available in actions for constitutional violations under §1983 where a defendant's conduct is shown to be motivated by evil motive or intent, or when the conduct involves reckless or callous indifference to the federally protected rights of others. *Smith v. Wade*, 461 U.S. 30, 56 (1983); *Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1308 (10th Cir. 2003).

191.    The Defendant Officers purposefully and intentionally aimed and fired their weapons at Plaintiff's groin. The circumstances, as previously alleged, indicate that they intended to hit and injure Plaintiff, or at least that they acted with reckless or callous indifference to Plaintiff's constitutional rights.

192.    Plaintiff accordingly requests an award of punitive damages against the Defendant Officers

as allowed under federal law.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, Stephen Fink, respectfully requests that this Court enter judgment in his favor and against the Defendants, jointly and/or severally, as follows:

a. General and compensatory damages in an amount that will fully and fairly compensate Plaintiff for his injuries, damages, losses, and violation of his federal constitutional rights available pursuant to 42 U.S.C. §1983 and any other applicable federal law;

b. Punitive damages against the Defendant Officers responsible for Plaintiff's injuries pursuant to federal law as punishment and deterrence against the commission of future such conduct;

c. Pre- and post-judgment interest;

d. Reasonable attorneys' fees, expert witness fees, and the cost of this action, pursuant to 42 U.S.C. §1988 and any other applicable federal law; and

e. Any other relief the Court deems proper and just.

**PLAINTIFF DEMANDS TRIAL TO A JURY ON ALL ISSUES SO TRIABLE**

Dated this 25th day of May, 2022.

Respectfully submitted,
BEEM & ISLEY, P.C.

 s/Clifford L. Beem
Clifford L. Beem
A. Mark Isley
Danielle C. Beem
730 - 17th Street, Suite 850
Denver, Colorado  80202
Ph:     303.894.8100
Fax:    303.894.8200
clbeem@beemlaw.net
amisley@beemlaw.net
dcbeem@beemlaw.net

BAUMGARTNER LAW, L.L.C.

 s/ S. Birk Baumgartner
S. Birk Baumgartner
Sean M. Simeson
Adam R. Yoast
300 E. Hampden Ave., Ste. 401
Englewood, CO 80113
Phone: (303) 529-3476
Fax: (720) 634.1018
birk@baumgartnerlaw.com
sean@baumgartnerlaw.com
adam@baumgartnerlaw.com

*Counsel for Plaintiff*

Plaintiff's Addresses:
c/o Baumgartner Law, LLC
300 E. Hampden Ave., Suite 401
Englewood, CO 80113